IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Sherrelle M. Hackett,

Plaintiff,

vs.                                  Case No. 13-2244-JTM

Zurich American Insurance Company,

Defendant.

MEMORANDUM AND ORDER

Sherrelle Hackett, who is African American, worked in the Overland Park, Kansas office for Zurich American Insurance Company from June 1, 2009 until her business unit was acquired by another company, Arrowhead, on October 1, 2012. Hackett continues to work for Arrowhead, and has filed the present action alleging racial discrimination and retaliation by Zurich during her employment with that company. Zurich has moved for summary judgment, and the court hereby grants that motion.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have

no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).[1]

### Findings of Fact

Zurich is an insurance company operating throughout the United States. Throughout her employment with Zurich, Hackett worked as a Rate Technician II or "Rater," an entry-level position responsible for providing rates to insurance policies. She

___

[1] Also before the court is the plaintiff's Motion for Leave to File a Surreply. (Dkt. 44). The motion seeks to counter the declaration of Mary Sean Ratzloff, which was attached to Zurich's Reply. Surreplies are disfavored, and are allowed only in the presence of "exceptional circumstances compelling the filing of such a pleading." *IMC Chemicals v. Niro*, 95 F.Supp.2d 1198, 1214 (D.Kan.2000). *See also ANR Pipeline v. Lafaver*, 76 F.Supp. 1142, 1150 (D. Kan. 1999). Because the Ratzloff affidavit does not address any essential issue in the action or otherwise affect any material finding of fact, leave for a surreply is denied.

was supervised by Shawn Heller for the first few years, and (after the middle of 2012) by Cindi Hodes. Zurich never discharged Hackett and, at least as of January 27, 2014, she continues to be employed by Arrowhead.

At the start of her employment, Hackett and a group of other Raters went through six weeks of training in a classroom-like environment. Afterwards, Hackett asked Heller whether she could repeat the course. However, Raters at Zurich were generally not allowed to retake the classes for several reasons. The classes were not continuously offered, were full when offered, and the trainers leading the courses often had full-time jobs to which they needed to attend.

Hackett attempts to dispute Heller's sworn statement on this point by noting that Zurich offered some subsequent training sessions. However, there is no evidence that any of the Raters, who were from sections other than Heller's, were in fact similarly situated to the plaintiff.

Moreover, nothing in the cited evidence controverts the facts advanced by Zurich – that the classes were not continuously offered, and that they were full when they were offered. As a result, it is uncontroverted that Heller decided that his Raters should not *retake* training classes. Heller believed that once Hackett was working in her role as a Rater, he could better assess what she knew and did not know. It is uncontroverted that whenever Hackett had questions about the position, she was encouraged to go to more senior Raters near her desk for assistance.

To supplement her classroom training, Hackett also received one-on-one training with Linda Kenny, a senior Rater. Kenny sat at Hackett's desk a few days each week and reviewed her work, identifying errors and answering questions. Later Hackett similarly trained with Donna Morris. Heller also encouraged Hackett to take advantage of internal webinars, insurance classes, and outside education to further her understanding and skills in rating.

It is uncontroverted that Hackett did not receive less training than any other Rater who reported to Heller.

Raters are largely evaluated on three objective metrics: (1) "productivity," *i.e.*, the number of items completed or "rated" in a month; (2) processing or "timeliness," *i.e.*, the percentage of items completed within deadline; and (3) number of errors or "quality control." Zurich's corporate office sets the standards for evaluating each Rater's performance. Quality control numbers are based on the number of errors in Raters' work, measured as a percentage. A separate quality control department was responsible for reviewing Raters' completed work and providing "quality control" numbers. Productivity and timeliness numbers are determined by the software program in which Raters work. Neither Heller nor Hodes had any involvement in determining these three measurements for Raters beyond entering the date each item was completed, after the Raters advised them their items were finished.

For 2009, the Raters' performance objectives included the following:

| Objective | Standard |
|---|---|
| Productivity | 200 items completed per month and higher = "Highly satisfactory"<br>121 to 199 = "Above average"<br>90 to 120 = "Meets/satisfactory"<br>76 to 89 = "Below satisfaction"<br>75 and below = "Poor performance" |
| Timeliness | Average number of items processed within goal of 95% completion ratio. |
| Quality Control | 95% and higher = "Highly satisfactory"<br>85 to 94% = "Above average"<br>75 to 84% = "Meets/satisfactory"<br>65 to 74% = "Below satisfaction"<br>64% and below = "Poor performance" |

In June of 2009, Hackett completed only 8 items. In July, she completed 24. On August 29, Heller issued Hackett a 30-day written warning "for unsatisfactory performance." At that time, Hackett had completed only 9 items. (She ultimately completed

some 27 items during the month of August.) It is uncontroverted that these numbers not only fell within the "poor performance" range for productivity, they were also far lower than the 44 items per month average for Raters who were hired and trained with Hackett. In addition to low productivity, Heller wrote in his warning to Hackett that "your work continues to need correcting."

The warning, which expired on September 26, 2009, did not impact Hackett's eligibility for salary increases or bonuses, awarded in March or April each year.

Despite the warning, Hackett's performance continued to be unsatisfactory. In 2009, Hackett completed on average 42 items per month, constituting "poor performance" under the Raters' objectives. Her average timeliness score of 91% was also below the 95% goal for Raters.

In March 2010, Heller delivered Hackett's 2009 year-end assessment, in which she received an overall score of two out of five, or "partially meets expectations." As a result of Hackett's overall two rating, she was ineligible for salary increase or bonuses in 2010. Nonetheless, Heller included both positive comments and areas for improvement in the assessment.

For 2010, the Raters' performance objectives included the following:

| Objective | Standard |
|---|---|
| Productivity | 161 items completed per month and higher = "Highly satisfactory"<br>121 to 160 = "Above average"<br>90 to 120 = "Meets/satisfactory"<br>76 to 89 = "Below satisfaction"<br>75 and below = "Poor performance" |
| Timeliness | 99% of items completed within goal and higher = "Highly satisfactory"<br>96 to 98% = "Above average"<br>95% = "Meets/satisfactory"<br>90 to 94% = "Below satisfaction"<br>89% and below = "Poor performance" |

| | |
|---|---|
| Quality Control | 99% and higher = "Highly satisfactory"<br>96 to 98% = "Above average"<br>90 to 94% = "Meets/satisfactory"<br>89% and below = "Below satisfaction"<br>64% and below = "Poor performance" |

Despite this lowering of productivity standards, Hackett's completion numbers for January and February 2010 continued to fall within the category of "Poor Performance," or 75 or fewer items. In January, Hackett processed 30 items, or less than half the number needed to reach the next performance category. In February, she completed only 51 items

In another warning issued to Hackett in March, 2010, Heller also highlighted issues with Hackett's quality and timeliness. Her 67% and 65% quality for January and February 2010 were well within the "poor performance" range. Similarly, her 83% and 79% timeliness ratios were also considered "poor performance." This warning did not, however, impact Hackett's eligibility for salary increases or bonuses.

Despite the second warning, Hackett did not significantly or consistently improve in her performance. In March and April 2010, Hackett's timeliness ratios were 83% and 84%, respectively, still within the "poor performance" range for timeliness. While she processed the minimum 90 items for "meets/satisfactory" in March, her numbers again dipped to 80 in April. Further, her average for 2010 overall was still in the "poor performance" range. Her 73% and 87% quality continued to constitute "poor performance."

Accordingly, on May 3, 2010, Heller placed Hackett on a 60-day Performance Improvement Plan identifying these three categories—productivity, quality control, and timeliness—as areas for improvement. The 60-day PIP did not impact Hackett's eligibility for salary increases or bonuses, awarded in March or April each year.

Overall in 2010, Hackett's productivity, quality control, and timeliness numbers all fell within the "partially meets expectations" or "below expectations ranges." Nonetheless, on March 8, 2011, Heller gave Hackett a "meets expectations" rating in her 2010 year-end assessment. As a result, Hackett was eligible for, and received, a salary increase and bonus

in 2011.

However, throughout 2011, Hackett's performance was deficient. For the year, Hackett averaged 59 items completed per month, below 2011's "poor performance" range of 69 items or less. Hackett's 86% quality control average was below the 95% goal. In light of these continued deficiencies, on February 27, 2012, Heller issued Hackett a two out of five, or "partially meets expectations" on her 2011 year-end assessment. As a result, Hackett was ineligible for salary increase in 2012.

On April 12, 2012, Heller placed Hackett on a 60-day Performance Development Plan. It is uncontroverted that a PDP is a tool to support effective employee performance development, but is not considered a corrective action. Further, Hackett's 60-day PDP had no impact on her salary increases or bonus. Hackett has admitted that the PDP "had no impact on her ability to post."

Hackett's completion average for 2012 at that time was 85%, below the 95% goal for timeliness. In January and February 2012, Hackett completed 47 and 76 items, respectively, which was also not within expectations.

Hodes became Hackett's supervisor in approximately May 2012, after an internal reorganization of the departments. Before Hodes and Hackett transferred to Arrowhead in October 2012, Hodes provided Hackett a 2012 year-end assessment, giving her an overall score of two out of five or "partially meets expectations." For 2012, Hackett completed an average 60 items per month ("poor performance"). Her completion ratio was 82%, below the 95% goal for timeliness. Further, Hackett's accuracy for the first quarter was 87.29%, below the 90% goal. Ultimately, Hackett's 2012 review had no impact on salary or bonus because her team transferred to Arrowhead on October 1, 2012.

Although only Hodes and Heller had the responsibility of providing Hackett's year-end assessments and discipline, other individuals reviewing Hackett's work arrived at the same conclusion concerning her deficient performance, for example:

7

- In March 2010, another Zurich employee e-mailed Heller concerning Hackett's work, writing "Might want to take a look at this QC. Major issues on this renewal."

- Underwriting Coordinator Melissa Morris wrote to Heller in March 2012 after reviewing Hackett's work that "[s]he is really missing some fundamentals."

- After sitting with Hackett in one-on-one training, Kenny wrote to Hodes that she had given Hackett instruction three times on a task "and once again it seems that the only ones that were right were the ones she did while I was sitting there."

During Hackett's employment with Zurich, she spoke to Human Resources only once about Heller. Six days after receiving her August 26, 2009 Written Warning, Hackett went to Tanya Brown, an employee in Zurich's Human Resources department, and reported two comments purportedly made by Heller. Specifically, she alleged that another Rater, Deanna Hansford, told Hackett that Heller had asked her whether Hackett and another Rater (both African-American) were "hood." Hackett never heard Heller make the comment, and Heller denies that he ever asked anyone whether Hackett was "hood" or was from the hood. Hackett herself does not actually believe "hood" connotes race. Rather, "hood" is "where people grow up."

Hackett also reported that Heller asked her, at some point, if she was from the country. She responded that she did not think that was a work-appropriate question and the conversation ended. In speaking with Brown, Hackett did not allege Heller's comments were related to race, or that she was being discriminated against.

Following her conversation with Hackett, Brown informed Heller that someone had complained about alleged "hood" and "country" questions, and advised he should refrain from making any comments that could be taken out of context. No mention was made of race or discrimination. Although Heller assumed that the person who complained about

the "hood" comment might be interpreting it as racial, he did not know that Hackett had reported the comment.

Although Hackett never reported any other comments to Human Resources or any management employees, she alleges that Heller made two other allegedly race-related comments during her employment with Zurich. Sometime in 2009 or 2010, Heller also told Hackett that "he knew this guy that was head of the boards that was in the country and he raises cows and stuff, but he's like a big CEO." Hackett also alleges in 2010 or 2011 Heller told her that one of his friends had once asked him if he was "down with the swirl."

None of the four comments Hackett alleges were made in connection with her evaluations or discipline. Hackett did not tell Heller at any point during her employment that she believed he was engaging in discrimination or making racially derogatory comments.

Notably, following the 2010 written warning, performance improvement plan, and performance development plan, Hackett wrote Heller "rebuttal" letters. None of these letters alleged discrimination or retaliation of any kind.

Hodes was not aware Hackett ever spoke to Human Resources concerning Heller or reported any comments she considered inappropriate for work.

At some point while under Hodes' supervision, Hackett indicated she wanted her attorney to review a document, but Hodes did not believe this had anything to do with race discrimination, retaliation, or any unlawful activity.

During Hackett's employment she filed several charges of discrimination and retaliation. In October 2009, Hackett filed a charge of discrimination against Zurich. She did not identify any individuals, and disputed only her August 2009 written warning as a form of race discrimination and retaliation. Zurich did not become aware of this 2009 charge of discrimination until mid-2010, when Hackett filed another charge of discrimination, disputing "performance improvement plans" as a form of race discrimination and

retaliation for filing a charge of discrimination. Hackett did not allege the existence of any racial remarks in this charge.

On April 19, 2012, Hackett filed another charge of discrimination against Zurich, alleging her performance evaluations and non-selection for different positions was retaliatory. She did not allege race discrimination. At no point in her employment did Hackett speak to anyone at Zurich about her charges of discrimination and, in turn, no one at Zurich ever spoke to her about the charges. Indeed, only the Human Resources department was aware of Hackett's charges of discrimination.

It is undisputed that Heller and Hodes were not aware that Hackett filed any charges of discrimination until after her employment with Zurich ended.

Hackett has applied for approximately 50 different positions with Zurich. She disputes her non-selection for seven of those positions, including Call Center Supervisor, Systems Administrator I, Account Representative II, Logistics Specialist, Billing Account Representative, Customer Support Consultant, and Senior Accounting Clerk. In each instance except for the application for the Systems Administrator position, the application was denied or cancelled although Hackett's application was deemed to be in good standing. As a general rule, to post for internal positions, an employee must be in "good standing," defined as having a performance rating of three or higher and not on any corrective action. At the time of the Systems Administrator I application, Hackett was not in good standing having received an overall two score on her 2009 year-end assessment

Hackett contends her non-selection was retaliatory, but not based on her race. However, none of the hiring managers, who were ultimately responsible for filling the seven disputed positions were aware of Hackett's charges of discrimination, complaints, or any other protected activity.

It is uncontroverted that Hackett's status had no impact on her ability to post as she was interviewed for the position, and the hiring manager's non-selection of Hackett had nothing to do with her performance as a Rater.

Indeed, for all those positions that were actually filled, the candidates were generally selected based on work experience, education, and interview. Hackett was not the most qualified candidate.

Two of the positions about which Hackett complains, Billing Account Representative and Account Representative II, were not filled by anyone; they were cancelled based on staffing needs. Hackett was not even eligible for the Call Center Supervisor position, which she applied for in November 2009, because an employee must be in her current role for one year to be eligible for promotion.

Hackett alleges she was discriminated against on the basis of her race by (1) not being provided the additional training that she wanted and (2) issuance of unjustified discipline and evaluations. She alleges she was retaliated against for her complaint to human resources and charges of discrimination in that (1) she was not provided the additional training that she wanted, (2) she was issued unjustified discipline and evaluations, and (3) she was not hired for seven positions for which she applied.

Hackett does not allege that she was paid less than other Raters. Rather, she simply disputes one or more missed salary increases and bonuses due to her evaluations and nonselection for promotion. Hackett believes Heller's decisions were both discriminatory and retaliatory, but she alleges that Hodes only engaged in retaliation, not race discrimination.

In her Response to the Motion for Summary Judgment, Hackett notes that under general Zurich policy, when an employee applies for a different position, an email is sent to the employee's current supervisor. The alleged fact is not material, however, as the facts otherwise establish that Hackett was in good standing for six of the seven positions which

formed the basis for her original complaint. Hackett now challenges only the failure to grant her the Customer Support Consultant position, and at that time she was in good standing. The only position for which she applied while not in good standing, the Systems Administrator I position, is unchallenged.

Noting that she was only one of two African-Americans on Heller's team, Hackett also argues that Heller either knew or suspected she was the individual who reported the "hood" comment to HR. However, the uncontroverted facts establish that even if Heller knew or suspected, it did not affect Hackett's employment. Rather, the evidence shows that Hackett's standing had no impact on her ability to apply or interview, and was not considered in her non-selection. Heller has affirmatively stated that he never spoke to any of the hiring managers, and plaintiff has offered no evidence which would controvert this fact. Indeed, Hackett otherwise specifically admits Zurich's uncontroverted fact stating that "none of the hiring managers, who were ultimately responsible for filling the seven disputed positions, were aware of Plaintiff's charges of discrimination, complaints, or any other protected activity."

Hackett asserts that she learned, during her interviews for the Customer Support Consultant position that "they were looking for someone internal," and that she seemed "a good fit." It is unclear who "they" were. Ultimately, positions in Customer Support went to Amanda Broome, an external candidate, and Melissa Conley, an internal hire. Still, as noted above, Hackett has otherwise admitted that none of the hiring managers knew of any protected activity.

Hackett does not dispute her objectively poor performance. She alleges, however, that there were other Raters with bad performance as well. She identifies two: Launa Wells and Rachel Humphrey. Wells got a "meets expectations" for 2009, even though she averaged only 35 items per month. In January and February, Humphrey completed only 10 and 18 items respectively.

But Hackett is able to claim better performance only by looking at a small chronological sample of the performance evaluations.   She has not demonstrated that either Wells or Humphrey is actually similarly situated. She makes no attempt to compare herself to either in terms of timeliness or quality control. In both measures, Wells (who is also African-American) did much better than Hackett. Zurich contends that Humphrey did in fact receive a written warning about her performance. More importantly, Humphrey is not similarly situated, given both her better performance in quality control (95%, or "meets/satisfactory," for Humphrey vs 91%, or "below satisfaction," for plaintiff) and timeliness (97%, considered "above average" versus 91%, considered "below satisfaction"), and in light of the fact that Humphrey was much newer on the job at the time, having started in 2010. That is, at the point of comparison, as a new hire Humphrey was outperforming Hackett, who had already been on the job for eight months.

### *Conclusions of Law*

Hackett has presented claims of racial discrimination and illegal retaliation. She contends that she was subjected to racial discrimination when Zurich refused to provide her with training necessary for her job, and issuing disciplinary notices and poor evaluations. She contends that she complained about discrimination, and was subjected to retaliation by similar denial of training, discipline, and evaluations. The court finds that the plaintiff's claims should be dismissed in light of the uncontroverted facts.

First, the plaintiff has failed to demonstrate a prima facie claim of race discrimination. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir.2013) (discussing burden-shifting framework of  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir.2005). Specifically, with respect to most of the events cited by the plaintiff, she has failed to demonstrate that she suffered a materially adverse job action during her employment at Zurich.

13

The uncontroverted facts establish that Hackett was given the minimum level of training given to all Zurich Raters. The evidence shows further that Heller determined, for entirely legitimate business reasons, that Raters in his section should not be allowed to re-take the six-week training session. The plaintiff has failed to provide any admissible evidence that simply repeating the same training session would have affected her pay, job duties, promotion opportunities or job status. Heller's determination that his Raters should be trained once was not a "materially adverse" job action which would support a prima facie claim for discrimination. *See Rennard v. Woodworker's Supply*, 101 Fed.Appx. 296, 307 (10th Cir. 2004).

The disciplinary write-ups were also not materially adverse job actions under the facts of the case. Notwithstanding the notices issued to Hackett, it is uncontroverted that she remained eligible, under Zurich's procedures, for purposes of her advancement or promotion to other positions. Specifically, the evidence shows that Hackett was in "good standing" for consideration for six of the seven interior positions for which she applied. Of those seven applications, the only one which Hackett now challenges is her non-selection to the position of Customer Support Consultant. But, as to that position, Hackett was in "good standing" at the time of her application.[2] The plaintiff has failed to show that any of the disciplinary notices affected any material aspect of her employment status.

Hackett was issued four evaluations during the relevant time from 2009 to 2012. She received a "meets expectations" evaluation in 2010, and a "partially meets expectations" in 2012, which she does not challenge. The lesser evaluations in 2009 and 2011 might be considered adverse job actions, but the court finds that her claim of discrimination as to these evaluations is deficient because Zurich had a legitimate and non-discriminatory

---

[2] Of the seven positions for which Hackett applied, the only one which occurred while she was not in "good standing" due to a disciplinary notice was her application for the System Administrator I position. The plaintiff does not challenge her non-selection for this position.

rationale for the training, discipline, and evaluations.[3] As to Heller's decision not to allow the Raters in his section to re-take the Rater training session, the evidence shows that Heller consistently applied this decision to all employees under his supervision. The training sessions were long (six weeks), were not continuously offered, and were frequently filled by trainees. The evidence also shows that Heller expected to be able to personally supervise his Raters to supply any additional instruction needed.

Hackett argues that, in two instances, other Raters were allowed to re-take training sessions, but she supplies no evidence as to the availability of those sessions for additional enrollees. There is no evidence that there were, in fact, open positions for additional training. More importantly, the evidence shows that these Raters were not supervised by Heller but by other individuals. Accordingly, those other Raters are not "similarly situated" for purposes of determining how Hackett was treated. *See EEOC v. PVNF*, 487 F.3d 790, 801 (10th Cir. 2007). Heller was the relevant decision-maker as to the training for Raters under his supervision, and Hackett concedes she received the same level of training as other Raters supervised by him.

The court finds that the disciplinary notes issued on March 5 and May 3, 2010, were not the product of racial discrimination. Rather, these evaluations were the product of Hackett's documented and consistent poor performance. These determinations were not the product of any subjective evaluation by Heller or any other Zurich supervisor, but were simply the product of objective criteria involving quality control, timeliness, and productivity.

Hackett suggests in her Response that this conclusion is undermined by the failure

---

[3] The plaintiff fails to present any showing of racial animus on the part of Zurich. In its motion for summary judgment, the defendant explicitly argues that alleged comments she attributes to Heller create no inference of discriminatory intent because (1) the "hood" comment was inadmissible hearsay, (2) the alleged "hood" and "country" comments are not race-related, and (3) the comments have nexus to any challenged decision. Hackett does not provide any rejoinder to these arguments in her Response (Dkt. 39) to the Motion for Summary Judgment.

to discipline two other Raters, Laura Wells and Rachel Humphrey. The court finds that Wells and Humphrey are not "similarly situated" to Hackett when all the relevant evaluations on all three performance criteria are considered. At the time of the March evaluation, Hackett had been on the job much longer than either Wells or Humphrey. By May, 2010, Humphrey (who processed 76 items) was more productive than Hackett (67 items); Hackett had an advantage over Wells (55 items) in that area only. As to the other areas of comparison, both of the newer employees had become far superior to Hackett. Humphrey and Wells were more timely (97% and 92% respectively) than Hackett (87%) and much better in avoiding errors (95% and 92% against 76%).[4]

Hackett has failed to show that the objective evaluations adopted by Zurich are a pretext for discrimination. The evidence shows, to the contrary, that Hackett consistently performed poorly throughout her employment at Zurich, and Hackett has not pointed to any other, similarly-situated, white Rater who did so poorly for so long and who did not receive similar treatment. Notably, Hackett explicitly advances no challenge to the 2011 year-end assessment, with its determination that she was not performing up to expectations because her "performance was deficient." The court's purpose is not to second-guess the employer's business decisions or substitute its own personnel judgments, but simply to determine if the employer's stated reasons were honestly held, and not a mask for discrimination. *See Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

The court will also grant summary judgment as to the plaintiff's claim of retaliation. Again, the plaintiff has failed to show that the supposed acts of retaliation (lack of repeat training, the disciplinary notes, and the year-end evaluations) actually constituted materially adverse job actions, with an immediate or practical effect on her job status, for the reasons previously explained, except as to the 2009 and 2011 year-end evaluations.

---

[4] In addition, the court notes that Wells, like Hackett, is African-American. Thus, even if the evidence were to show that her performance was comparable to Hackett's, this would not create an inference of racial discrimination.

16

As to all of the alleged adverse job actions, however, the plaintiff has failed to demonstrate the existence of a causal relationship between her alleged protected activity (her HR complaint about the alleged "hood" comment and her charges of discrimination) and the alleged adverse actions. Here, the uncontroverted evidence shows that the decisions regarding the promotions to other positions were rendered by other managers who had no awareness of the alleged protected activity.

Similarly, there is no evidence that Hodes or Heller knew of the protected activity. Even if Heller, as Hackett argues in her Response, might have suspected it was she who complained about the "hood" comment, this does not give rise to an inference of retaliation. As noted earlier, the plaintiff makes no response to Zurich's argument that the "hood" comment cannot be viewed as a complaint of race bias or discrimination.

Even if the court were to conclude otherwise, there is still no inference of discrimination given the timing of the relevant events. *See Meiners v. University of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004) (inference of causation may arise from close temporal proximity between events). The first allegedly adverse actions by Heller that are now cited by Hackett, namely, his refusal to allow her to repeat the six-week training session and the first written warning, occurred *before* the alleged protected activity. The subsequent 2009 year-end assessment and PIP were issued well into 2010, and no inference of causation therefore arises.

Hackett has identified in her Response two instances of supposed protected activity — her April 19, 2012 Charge of Discrimination, and her earlier notice to the HR department of the alleged "hood" comment. However, Hackett has admitted that she did not complain of the "hood" comment as being race-related, and has not challenged Zurich's argument on the issue. As indicated earlier, Hackett has also failed to demonstrate that Zurich gave preferential treatment to any non-African American Rater who performed as consistently poorly as she did.

The 2012 Charge of Discrimination, in contrast, is clearly a protected activity, and Hackett now argues that there is a sufficiently close temporal proximity between that complaint and the 2012 year-end evaluation. However, as noted above, the 2012 evaluation did not preclude Hackett from any specific promotion opportunities. Of the seven positions Hackett applied for, only one (Systems Administrator I) was thwarted by an adverse evaluation. But Hackett does not challenge the denial of the Systems Administrator application. Rather, she challenges the denial of the Customer Support Consultant position. Yet, for that position, Hackett remained in "good standing." Further, the Customer Support Consultant application occurred in November of 2011, more than two years after Hackett's complaint to HR regarding Heller's "hood" comment, a delay far beyond that which might give rise to an inference of retaliation. *See Hanson v. Colorado Judicial Dept.*, __ Fed.Appx. __, 2014 WL 1677874, *3 (10th Cir. April 29, 2014) (finding "four-month period is too protracted to permit an inference of retaliation"). Because Hackett has failed to show that any actual adverse job action followed closely after any protected activity, or otherwise was actually motivated by a retaliatory intent, summary judgment is appropriate.

Finally, even if Hackett had demonstrated a prima face case of illegal retaliation, the court finds that (as discussed above) that Zurich had a legitimate, non-discriminatory rationale for its treatment of the plaintiff. Given the scarcity of training slots, Heller could legitimately decide that Raters in his section should not repeat the six week class. Further, the evaluations of Hackett were premised on objective criteria which consistently showed poor performance.

Hackett has failed to show that Zurich's application of these standards was a pretext for retaliation. She has not shown that she was the best candidate for the Customer Support Consultant position. Given her objective performance scores, the plaintiff has failed to demonstrate that Heller did not in good faith believe that Hackett was an inferior Rater in comparison to others in his section. And the evidence shows that the hiring managers for

the other positions, including the Customer Support Consultant had no knowledge of any complaints or protected activity by Hackett.

IT IS ACCORDINGLY ORDERED this 11th day of June, 2014, that the defendant's Motion for Summary Judgment (Dkt. #33 ) is granted; plaintiff's Motion for Leave (Dkt. #44 ) is denied.


<u>s/J. Thomas Marten</u>
J. THOMAS MARTEN, CHIEF JUDGE